Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

MICHAEL ANDERSON, derivatively on
behalf of ONTRAK, INC.,

      Plaintiff,

      v.

TERREN S. PEIZER, BRANDON H.
LAVERNE, CURTIS MEDEIROS,
RICHARD A. BERMAN, MICHAEL
SHERMAN, EDWARD ZECCHINI,
DIANE SELOFF, ROBERT REBAK,
GUSTAVO GIRALDO, and
KATHERINE QUINN

      Defendants,

      and

ONTRAK, INC.,

      Nominal Defendant.

Case No.:

# **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

# **DEMAND FOR JURY TRIAL**

## INTRODUCTION

Plaintiff Michael Anderson ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Ontrak, Inc. ("Ontrak" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Terren S. Peizer, Brandon H. LaVerne, Curtis Medeiros, Richard A. Berman, Michael Sherman, Edward Zecchini, Diane Seloff, Robert Rebak, Gustavo Giraldo, and Katherine Quinn (collectively, the "Individual Defendants," and together with Ontrak, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of Ontrak, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ontrak, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Ontrak's controlling shareholder, directors, and officers between August 5, 2020 through February 26, 2021, both dates inclusive (the "Relevant Period").

2.     Ontrak is a Delaware healthcare company. Its "Predict-Recommend-Engage" platform organizes and automates healthcare data integration and analytics. A core part of

this "Predict-Recommend-Engage" Platform is "Ontrak solutions" which provide healthcare solutions  to members with behavioral conditions resulting in chronic medical conditions. The Company marketed itself as able to use predictive analytics and human engagement to provide treatment for healthcare plan members suffering from behavioral problems who generated high healthcare costs. Ontrak's programs could purportedly reduce the costs these members incurred.

3.      The Company's largest customer was Aetna Inc. ("Aetna"). In November 2020, the Company disclosed that Aetna was  undertaking a compliance review of the Company "despite the customer having no compliance issues or concerns with Ontrak." The Company also indicated that it planned for a "significant expansion" with Aetna.

4.      This was untrue. Aetna had instead tasked the Company with completing a corrective action plan and to submit information to Aetna demonstrating "meaningful measures" of the benefits from Ontrak's programs. The Company did not do this by the end of the 2020 fiscal year, in time for Aetna to renew its contract with Ontrak, and in fact by February 2021, Ontrak's Chief Executive Officer ("CEO") informed employees that Aetna would not be renewing.

5.      During the time that this was known but not disclosed, the Company conducted offerings of preferred stock, which collectively raised approximately $90 million.

6.      Subsequently, on Mach 1, 2021, the Company disclosed in a press release that Aetna had in fact terminated its contract with the Ontrak after "evaluat[ing] on a provider basis[.]" This evaluation was "based on [Ontrak's] ability to achieve the lowest possible cost per medical visit, and not on [Ontrak's] clinical outcomes data or medical cost savings." Due to this contract termination, Ontrak revised downwards its revenue guidance for the 2021 fiscal year.

7.      On news of this press release, the Company's share price declined by approximately 46%, or $27.32, closing at $31.62 per share on March 1, 2021.

8.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was being evaluated on how it executed on a corrective action plan sent by its largest customer, though the Company had no plans to meaningful address this corrective action plan; (2) due to this evaluation, the Company's largest customer was not likely to find Ontrak to be effective and was therefore likely to not renew its contract with Ontrak; (3) the loss of its largest customer would significantly harm the Company's revenue and financial results; (4) therefore, Ontrak could not achieve its projected revenue guidance for the 2021 fiscal year; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Ontrak's public statements were materially false and misleading at all relevant times.

9.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

10.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

11.     In light of the Individual Defendants' misconduct, which has subjected the Company, its Executive Chairman and former CEO, its Chief Financial Officer ("CFO"), and its former Chief Operating Officer ("COO") to a consolidated securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), and further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company

and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

12.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the Executive Chairman's, CFO's, and former COO's liability in the Securities Class Action, of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

Verified Shareholder Derivative Complaint

18.     Venue is proper in this District because Ontrak's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

19.     Plaintiff is a current shareholder of Ontrak. Plaintiff has continuously held Ontrak common stock since before the beginning of the Relevant Period. Plaintiff is a citizen of Utah.

**Nominal Defendant Ontrak**

20.     Ontrak is a Delaware corporation with its principal executive offices at 2120 Colorado Ave., Suite 230, Santa Monica, California 90404. Ontrak's shares trade on the NASDAQ under the ticker symbol "OTRK."

**Defendants**

21.     Defendant Terren S. Peizer ("Peizer") is the founder of Ontrak and was CEO from 2003 to April 12, 2021. He has been Chairman of the Company's Board since 2003 and became Executive Chairman on April 12, 2021. He is a controlling shareholder of Ontrak who owns 52.1% of the Company's outstanding stock as of June 10, 2021. Defendant Peizer is also named as a defendant in the Securities Class Action. He is a citizen of California.

22.     Defendant Brandon H. LaVerne ("LaVerne") has been the CFO of Ontrak since 2020. He is named as a defendant in the Securities Class Action. Upon information and belief, he is a citizen of Nevada.

23.     Defendant Curtis Medeiros ("Medeiros") was Ontrak's President and COO from December 2019 until April 2021. He is named as a defendant in the Securities Class Action. Upon information and belief, he is a citizen of Florida.

24.     Defendant Richard A. Berman ("Berman") has been a director of the

5

Verified Shareholder Derivative Complaint

Company since 2014. He is Chairman of the Audit Committee. Upon information and belief, he is a citizen of Florida.

25.    Defendant Michael Sherman ("Sherman") has been a director of the Company since 2017. Upon information and belief, he is a citizen of New York.

26.    Defendant Edward Zecchini ("Zecchini") has been a director of the Company since 2018. Upon information and belief, he is a citzen of New York.

27.    Defendant Diane Seloff ("Seloff") has been as a director of the Company since 2018. She is a member of the Audit Committee. Upon information and belief, she is a citizen of Tennessee.

28.    Defendant Robert Rebak ("Rebak") has been a director of the Company since 2019. Upon information and belief, he is a citizen of New Jersey.

29.    Defendant Gustavo Giraldo ("Giraldo") has been a director of the Company since 2019. He is a member of the Audit Committee. Upon information and belief, he is a citizen of Florida.

30.    Defendant Katherine Quinn ("Quinn") has served as a director of the Company since August 2020. Upon information and belief, she is a citizen of Arizona.

## <u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

31.    By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Ontrak and because of their ability to control the business and corporate affairs of Ontrak, the Individual Defendants owed Ontrak and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ontrak in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ontrak and its shareholders so as to benefit all shareholders equally.

32.    Each controlling shareholder, director, and officer of the Company owes to Ontrak and its shareholders the fiduciary duty to exercise good faith and diligence in the

Verified Shareholder Derivative Complaint

administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of Ontrak, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.     To discharge their duties, the controlling shareholder, officers, and directors of Ontrak were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

35.     Each Individual Defendant, by virtue of their position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of Ontrak, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Ontrak's Board at all relevant times.

36.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's

business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

37.    To discharge their duties, the officers and directors of Ontrak were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Ontrak were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Ontrak's own Code of Ethics and Business Conduct;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Ontrak conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Ontrak and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Ontrak's operations would comply with all applicable laws and Ontrak's financial statements and regulatory filings filed with

the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

38. Each of the Individual Defendants further owed to Ontrak and the shareholders the duty of loyalty requiring that each favor Ontrak's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

39. At all times relevant hereto, the Individual Defendants were the agents of each other and of Ontrak and were at all times acting within the course and scope of such agency.

40. Because of their advisory, executive, managerial, directorial, and controlling positions with Ontrak, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

41. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Ontrak.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

Verified Shareholder Derivative Complaint

42.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

43.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

44.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Ontrak was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

45.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct

part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

46.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ontrak, and was at all times acting within the course and scope of such agency.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

47.    Ontrak is a Delaware healthcare company. Its "Predict-Recommend-Engage" platform organizes and automates healthcare data integration and analytics. A core part of this "Predict-Recommend-Engage" Platform is "Ontrak solutions" which provide healthcare solutions to members with behavioral conditions resulting in chronic medical conditions. The Company marketed itself as able to use predictive analytics and human engagement to provide treatment for healthcare plan members suffering from behavioral problems who generated high healthcare costs. Ontrak's programs could purportedly reduce the costs these members incurred.

48.    The Company's largest customer was Aetna. For example, in the Company's quarterly report with the SEC for the fiscal quarter ended September 30, 2020, Ontrak disclosed that Aetna accounted for 63.9% of the Company's revenue for the three months ended September 30, 2020.

49.    In November 2020, the Company disclosed that Aetna was undertaking a compliance review of the Company "despite the customer having no compliance issues or concerns with Ontrak." The Company also indicated that it planned for a "significant expansion" with Aetna.

50.    As part of the compliance review, Aetna had tasked the Company with completing a corrective action plan and to submit information to Aetna demonstrating "meaningful measures" of the benefits from Ontrak's programs. The corrective action plan

also required the Company to take other measures, such as showing that use of Ontrak's "care coaches" led members to meet with therapists.

51.     The Company did not implement the corrective action plan or satisfactorily answer Aetna's questions. The Company failed to implement the corrective action plan in 2020, in time for Aetna to renew their contract with the Company. By February 2021, Ontrak's Chief Executive Officer ("CEO") informed employees that Aetna would not be renewing.

### *Ontrak Performed Subpar Services and Improperly Billed*

52.     Former employees cited in the first amended class action complaint in the Securities Class Action provided insight into how the Company's practices did little to actually reduce the high healthcare costs of members suffering from behavioral issues.

53.     Ontrak's Director of Member Engagement Specialists Training from September 2016 until March 2018 (identified as "FE4") noted that Ontrak's member engagement specialists merely received a list of names of customer's healthcare members who had: i) a chronic medical condition; ii) a history of substance abuse or mental health problems, and iii) had generated $7,500 or more in health plan benefits. According to FE4, member engagement specialists would call the names on these lists, inform them that they were entitled to additional benefits under their plan and that their insurer wanted to be proactive with their health, and attempt to enroll the person with Ontrak. If they did enroll, they were then an "Ontrak member."

54.     A former member engagement specialist (identified as "FE5"), noted that due to medical privacy laws, there was no indication on these lists of who suffered from what medical conditions, and so in the course of these calls the member engagement specialists attempted to figure it out by asking probing questions.

55.     If a person decided to become an Ontrak member, they were then referred to an Ontrak "care coach." According to FE4, once an Ontrak member decided on a plan with a care coach, they would be directed to a "clinical operations coordinator" who would then

set up appointments with psychiatrists, dietitians, counselors, or other specialists in-network. The member could not do this on their own.

56.     A former Director of Quality and Organizational Performance (identified as "FE1") at Ontrak, from February 2017 to December 2020, noted that Ontrak's program lasted 52 weeks.

57.     FE4 stated that Aetna provided 85% of Ontrak's outreach pool, and was thus the largest source of Ontrak member. FE4 also stated that Aetna paid Ontrak $750 for each member that Ontrak enrolled and further that Aetna provided outreach scripts to Ontrak to use when reaching out to Aetna members.

58.     A former quality assurance analyst at Ontrak (identified as "FE6"), described how Ontrak billed Aetna for each time an Ontrak member interacted with their care coach, which consisted at least of a once-a-month check-in. Another former member engagement specialist (identified as "FE7"), noted that even if the care determined appropriate for a person was not covered by their underlying healthcare plan, and Ontrak knew this, that Ontrak would still enroll them as an Ontrak member to charge Aetna for up to three months of covered care coach check-ins despite their being no possibility of further services.

59.     Another of Ontrak's member engagement specialists (identified as "FE8") who worked at Ontrak for four years, was appointed to a data algorithm team whose goal was to identify why so many Aetna members were ultimately being deemed ineligible for further Ontrak services. They found that Aetna Medicare plans did not cover mental health treatment. However, when Ontrak billed Aetna for these members' not-covered mental health treatment, Aetna would sometimes pay the first bill anyways. According to FE8, as a result of this, Ontrak's management did not want to resolve the issue of so many Aetna members enrolling and then later being deemed ineligible.

60.     A former Ontrak design researcher and strategist (identified as "FE3"), whose job was to quantify Ontrak's benefit to Aetna, noted that by May 2020, Aetna was seriously doubting the value Ontrak provided to Aetna. Emblematic of this doubt was Aetna's

decision in May 2020 to stop providing Ontrak with the information needed to reach out to new Aetna members to try to enroll them with Ontrak, which, as related above, FE4 indicated was as much as 85% of Ontrak's outreach pool. FE5 corroborated this, noting that by September 2015 he stopped receiving new names to reach out to and instead was tasked with reaching out to already-contacted people over and over again.

61.    A former Director of Operations at Ontrak (identified as "FE2"), stated that Aetna and the Company had conference calls every Friday to discuss ongoing issues. Dr. Bill Gillis, Aetna's Clinical Director of Behavioral Health Operations and Program Design, began joining these calls once Aetna became suspicious of Ontrak's billing practices, and, according to FE2, would "tear [the Ontrak team] a new one" on the calls. Aetna's chief issue was for being billed when no services were being provided. When Ontrak countered by noting that even if further services could not be provided, that members did get to talk to care coaches, Aetna requested records of this. Aetna then determined that in some cases, even as they got billed for care coach meetings, these meetings did not occur but they were still billed.  FE2 noted that this issue was raised even before Aetna demanded the Company adhere to a corrective action plan in July 2020.

62.    When the corrective action plan was transmitted to the Company, Ontrak was given sixty days to answer. Aetna wanted evidence of the benefit Ontrak was providing to Aetna members, clarity about the Company's billing practices, a showing that speaking to care coaches translated into members actually seeing therapists, and assurance that Ontrak was adhering to proper practices in enrolling members. Moreover, Aetna wanted a refund for certain payments it made to Ontrak despite members not actually receiving any services. According to FE1 and FE2, they understood this corrective action plan to signal the end of Aetna's relationship with Ontrak.

63.    Following the receipt of the corrective action plan in July 2020, FE1 joined in three days of Zoom meetings with Ontrak executives, led by Defendant Medeiros, to discuss it. FE1 recounted that the executives in the meetings did not consider the corrective

action plan to be a serious issue, and wanted to do the bare minimum to address it. FE1 specifically recounted that Charles Polatsek, Ontrak's Vice President of Sales and Strategic Partnerships, stated that Aetna was just trying to scare them and was not going to act.

64.    FE1 stated that the Company never fully completed the corrective action plan, and only provided Aetna with partial responses to some of their questions. FE2 stated that after providing this incomplete response, Aetna provided no acknowledgment for three months.

65.    FE7 recalled that in the summer of 2020, Ontrak member engagement specialists became aware of job postings by Aetna for their own member engagement specialist positions. They were concerned that these postings indicated that Aetna planned to sever ties with the Company and create their own in-house member engagement team, which would devastate the Company given how much of Ontrak's business came from Aetna. In response, the Company began holding monthly Zoom meetings open to all employees; during one such call, FE7 remembered an employee asking senior management if employees' jobs were at risk. The question went unanswered.

66.    FE3 said that the Company still had not completed Aetna's corrective action plan by the end of the year, 2020, and that for this reason she was concerned Aetna would not renew its contract. FE7 similarly recalled that in an early 2021 Zoom meeting, Defendant Peizer told employees that he would "pray" that Aetna renewed the contract.

67.    In January or February of 2021, FE6 stated that Defendant Peizer emailed the entire Company to alert them that Aetna was not renewing its contract. In a subsequent Zoom meeting, Defendant Peizer stated that no one was getting laid off and that the Company would recover. Another former employee who attended this meeting (identified as "FE9"), stated that Defendant Peizer cried throughout the meeting.

**False and Misleading Statements Made During the Relevant Period**

***August 5, 2020 Press Release, Quarterly Report, and Earnings Call***

68.     On August 5, 2020, Ontrak issued a press release announcing its financial results for the fiscal quarter ended June 30, 2020. The press release contained a statement from Defendant Peizer that during the second quarter, the Company "grew [its] pipeline of potential new customers to its most robust level in the company's history."

69.     The same day, Ontrak filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2020, (the "2Q20 10-Q"). It did not disclose the Company's receipt of Aetna's corrective action plan in July or otherwise note any issues in the relationship with the Company's largest customer. The 2Q20 10-Q was signed by Defendants Peizer and LaVerne and contained certifications, also signed by Defendants Peizer and LaVerne, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 2Q20 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

70.     Later on August 5, 2020, the Company held a conference call concerning its second quarter 2020 financial results.  On the call, Defendant Peizer postured as if Ontrak's business with Aetna was growing, saying, in relevant part:

> Whether it is further expansions with Aetna and other existing customers, the impending launch of our signed Cigna expansions, enhancements to our algorithms feeding the outreach pool or potential new logos and pilots, I'm really excited to see the hard work, dedication, passion and grit of every Ontrak teammate as we proceed onto new heights.

71.     The statements and omissions made on August 5, 2020 referenced above were false and misleading for a number of reasons. In May 2020, Aetna stopped providing the Company with potential new members, meaning that the Company's "pipeline of potential new customers" was much worse off than before, not at "its most robust level in the company's history." In addition, the Company had received numerous inquiries from Aetna regarding their billing practices before receiving a corrective action plan which challenged

the efficacy of Ontrak's services. Ontrak was largely planning to ignore this corrective action plan, which undoubtedly negatively implicated the Company's relationship with Aetna. This further negates the idea that the Company was better positioned than ever before to acquire new customers. And, given that the receipt of the corrective action plan indicated that Aetna may take more action if the Company did not adhere to the plan, this constituted a material risk to the Company which warranted disclosure or at least mention in the 2Q20 10-Q. This is especially true given that Aetna generated well over half of the Company's revenue. Finally, , it was misleading for Defendant Peizer to indicate that business would expand with Aetna, when in fact there were serious indicators, including Aetna cutting the Company off from potential new customer lists and demanding the Company adhere to a corrective action plan, that business would contract or terminate altogether, as eventually happened.

72.    Following this series of false and misleading statements which artificially inflated the value of the Company's stock, the Company was able to close a preferred stock offering on August 26, 2020, with aggregate gross proceeds of $48.9 million, after accounting for the full exercise of the underwriters' overallotment option which closed on September 8, 2020.

### *November 5, 2020 Press Release, Quarterly Report, and Earnings Call*

73.    On November 5, 2020, the Company issued a press release announcing its financial results for the fiscal quarter ended September 30, 2020. The press release quoted Defendant Peizer as stating that: "New compliance reviews conducted by our largest customer for all of its vendors disrupted data refreshes from July, ***despite the customer having no compliance issues or concerns with Ontrak***." (Emphasis added.) It further quoted him as stating that "Ontrak's rapid engagement and enrollment of the members of one of our largest plan partners exceeded estimated rates to such an extent that they asked us to reschedule further enrollment to 2021 to allow their budget to catch up."

74.     Moreover, the press release highlighted that revenue for the third quarter had grown 172% year-over-year, 39% quarter-over-quarter, and that "[r]evenue [g]rowth in 2021 [is] expected [to be] in excess of 100%[.]"

75.     The statements above from the November 5, 2020 press release were false and misleading and failed to disclose that Aetna did have compliance issues and concerns specific to Ontrak, regarding both the efficacy of their services and their billing practices. Aetna had sent the Company a corrective action plan in July 2020 and expected the Company to implement it and to substantively answer Aetna's questions, which the Company was not planning to do. In light of this, it was false and misleading to suggest that enrollment was going so well that "one of [Ontrak's] largest plan partners" was progressing so quickly that they needed Ontrak to stop enrolling new members. Additionally, projecting revenue growth of 100% was completely unrealistic and unsupported at the time that projection was made, because the Company's largest customer was at serious risk of terminating its contract with Ontrak, which it later did.

76.     Later on November 5, 2020, the Company held an earnings conference call with investors and analysts. After repeating the expected revenue growth figure of 100%, Defendant Peizer attempted to further explain away Aetna's compliance review of the Company, stating:

> [W]e would also like to point out that our largest customer is conducting compliance reviews of all of their vendors. ***These reviews have disrupted data refreshes for the Ontrak program since July, putting further pressure on our outreach pool numbers despite the customer having no compliance issues or concerns with Ontrak. . . . Importantly, this is one of the plans for which we anticipate continued significant expansion.***

(Emphasis added.)

77.     Asked by Charles Rhee of Cowen and Company, LLC about these developments, Defendant Medeiros said: "So as far as timing with the expected data

refreshes to be turned back on, ***we have a mutual agreement with the client based on our current understanding that we expect the data to be turned back on by the end of the year.***" (Emphasis added.)

78.     Defendant Medeiros continued by stating later on the call that, "with Aetna, we have scheduled multiple geography expansions that we hope to sign in the fourth quarter and roll out early in the year."

79.     Defendant Peizer further discussed on the call a potential expansion with Aetna into servicing members with depression and anxiety. Defendant Peizer indicated that though the Company was not currently included on any such plans that, "I would be surprised, and ***we would all personally be surprised and disappointed, if the expansions that we are alluding to don't happen in 2021.***" (Emphasis added.)

80.     Further, Defendant Peizer reiterated on the call that "data refresh" was not a performance issue. Responding to Richard Collamer Close of Cannacord Genuity Corp., Defendant Peizer said that "***it really has nothing to do with us.*** In fact, quite the contrary. Was just a gut punch because it really does impact our ability to optimize what our capability is." (Emphasis added.)

81.     The statements on the November 5, 2020 conference call were false and misleading. As stated, Aetna did have specific compliance issues and concerns with Ontrak, concerning its efficacy and its billing practices, and had transmitted a corrective action plan to the Company in July 2020 expressing these concerns months before. Still, Defendants Peizer and Medeiros made these statements indicating that this was a routine compliance check that had nothing to do with the Company specifically. In light of this fact and that the Company did not plan to significantly address the concerns raised by the corrective action plan, it was completely false and misleading for Defendant Peizer and Medeiros to posture as if Ontrak had plans, or was extremely confident of future plans, to expand into new geographies and patient groups with Aetna, given that Aetna's corrective action plan was essentially being ignored and that they were therefore unlikely to give new

business to the Company. Finally, Defendant Medeiros' statement that the Company had a "mutual agreement" with Aetna to have "the data [] turned back on by the end of the year" was simply false. There was no agreement and given that Aetna's corrective action plan was not being acted on, it was unlikely Aetna would turn the data "back on" without the Company taking meaningful steps to address Aetna's concerns. In fact, Aetna would not only not turn the data "back on" but would decide not to renew their contract with the Company.

82.     Also on November 5, 2020, Ontrak filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2020, (the "3Q20 10-Q"). The 3Q20 10-Q was signed by Defendants Peizer and LaVerne and contained SOX certifications also signed by Defendants Peizer and LaVerne. The 3Q20 10-Q omitted any reference to Aetna's corrective action plan or the Company's response to it.

83.     The 3Q20 10-Q contained the following table showing the "concentration of credit risk by customer revenue as a percentage of total revenue:"

| Percentage of Revenue | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Largest customer | 63.9 % | 45.6 % | 48.4 % | 33.6 % |
| 2nd largest customer | 13.6 | 15.2 | 15.1 | 20.1 |
| 3rd largest customer | 9.6 | 14.4 | 11.9 | 16.3 |
| 4th largest customer | 7.8 | 10.0 | 9.7 | 12.8 |
| Remaining customers | 5.1 | 14.8 | 14.9 | 17.2 |
| | 100.0 % | 100.0 % | 100.0 % | 100.0 % |

84.     Moreover, the 3Q20 10-Q noted that:

**A substantial percentage of our revenues are attributable to four large customers, any or all of which may terminate our services at any time.**

Four customers accounted for an aggregate of 95% and 85% of our total revenue for the three months ended September 30, 2020 and 2019, respectively, and four customers accounted for an aggregate of 85% and 83% of our revenue for the nine months ended September 30, 2020 and 2019,

respectively. Also, four customers represented an aggregate of 100% and 89% of our total accounts receivable as of September 30, 2020 and December 31, 2019, respectively. We expect that revenues from a limited number of customers will continue for the foreseeable future. Sales to these customers are made pursuant to agreements with flexible termination provisions, generally entitling the customer to terminate with or without cause on limited notice to us. We may not be able to keep our key customers, or these customers may decrease their enrollment levels. Any substantial decrease or delay in revenues relating to one or more of our key customers would harm our financial results. If revenues relating to current key customers cease or are reduced, we may not obtain sufficient enrollments from other customers necessary to offset any such losses or reductions.

85.     Moreover, the 3Q20 10-Q stated that:

**Our programs may not be as effective as we believe them to be, which could limit our potential revenue growth.**

Our belief in the efficacy of our Ontrak solution is based on a limited experience with a relatively small number of patients. Such results may not be statistically significant, have not been subjected to close scientific scrutiny, and may not be indicative of the long-term future performance of treatment with our programs. If the initially indicated results cannot be successfully replicated or maintained over time, utilization of our programs could decline substantially. There are no standardized methods for measuring efficacy of programs such as ours. Even if we believe our solutions are effective, our customers could determine they are not effective by utilizing different outcome measures. In addition, even if our customers determine our solutions are effective they may discontinue them because they determine that the aggregate cost savings are not sufficient or that our programs do not have a high enough return on investment. Our success is dependent on our ability to enroll third-party payor members in our Ontrak solutions. Large scale outreach and enrollment efforts have not been conducted and only for limited time periods and we may not be able to achieve the anticipated enrollment rates.

86.     The statements and omissions in the 3Q20 10-Q were false and misleading. While the 3Q20 10-Q noted the size of Ontrak's largest customer, Aetna, and contained generic risk warning about the possibility of losing business from its largest customers and about the potential of customers finding Ontrak's programs ineffective, it couched these risks warnings in speculative and hypothetical language. It did not make any mention of

the specific, known risk facing the Company of losing Aetna's business, as opposed to any large customers, because Aetna had specific concerns about the Company's efficacy and billing practices, had communicated these concerns to the Company, and had set out specific steps it wanted the Company to take to remedy these concerns. Moreover, as the Company was not adhering to Aetna's corrective action plan, which the 3Q20 10-Q did not even discuss, there was a heightened risk of losing Aetna's business which would severely impact the Company's revenue, as ultimately happened.

### *November 2020 Analyst Reports*

87.    The market accepted the Individual Defendants' false and misleading statements as true. Cannacord Genuity Corp. issued a November 5, 2020 report to explaining that Aetna was not sharing potential new customer data with Ontrak because "CVS required all 3rd party vendors, including those for Aetna, to be reviewed for compliance requirements," but that Ontrak was otherwise "continu[ing] to execute. Likewise, Cowen and Company issued its own November 5, 2020 report that highlighted Ontrak's growing enrollment and did not place great weight on "a data feed issue from [Aetna]."

88.    In a subsequent November 25, 2020 report from Cowen and Company, titled "Takeaways from Investor Meetings with Management," Cowen and Company reported that Ontrak's management "expects the data feed issue with [Aetna] to be resolved in Dec.," and that management planned an "expansion with [Aetna] (already in late stages)."

89.    These statements by Ontrak's management to Cowen and Company were false and misleading because they indicated that Aetna's cutting the Company off from potential new customer data was likely to be resolved in December and that the Company had late stage expansion plans with Aetna.  This was untrue. Aetna had transmitted a corrective action plan to Ontrak in July and the Company was not acting on it. Therefore, it was completely baseless to assert that the differences between the companies would be

resolved by December and that an expansion was "already in late stages." In fact, Aetna would soon decide to cease doing business with Ontrak.

90.   Still, while the price of Ontrak securities was artificially inflated by Defendants' false and misleading statements, Ontrak closed another offering of preferred stock on December 21, 2020, raising gross proceeds of approximately $42.8 million. This offering and the August 2020 preferred stock offering demonstrate the Individual Defendants motive in promulgating the false and misleading statement, so that they could raise money while the Company's stock was buoyed by artificially inflated prices.

**The Truth Emerges but the False and Misleading Statements Continue**

91.   On March 1, 2021, Ontrak issued a press release announcing the Company's financial results fourth quarter and full fiscal year ended December 31, 2020. The press release revealed that the Company's largest customer had terminated its contract with Ontrak, effective June 26, 2021.

92.   The press release contained statements from Defendant Peizer, stating in relevant part:

> Mr. Peizer continued, "After a long process with our largest customer where we believed we were working towards an extended and expanded contract, *we were notified after market close on February 26, 2021 that our participation status with this customer will be terminated effective June 26, 2021. We were advised to stop enrollment of new members for this customer and await guidance from the customer on transition plans for the 8,400 members who are currently benefiting from the Ontrak program.* We remain fully committed to the health plan and to its members, and will ensure that every member receives quality care through the transition, so that pandemic-related anxiety is not heightened by the change in the member's care team."
>
> Mr. Peizer added, "*The relationship with our Ontrak-A customer was unique, because they evaluated Ontrak on a provider basis, not as a vendor as do all of our other health plan partners. As such, the customer evaluated our performance based on our ability to achieve the lowest possible cost per medical visit, and not on our clinical outcomes data or medical cost savings, which were meaningful and significant.* Unlike our other health plan partners, we interacted only with the behavioral health division, with no involvement from the medical division of the plan. *We believe that the*

***coaching model which Ontrak has pioneered for over a decade was seen by the customer to be less relevant to their performance metrics.*** We have consistently found that our care coaches have a tremendously positive impact on member experience and readiness to engage with the healthcare system. This is the reason that many digital healthcare apps are now building care coaching into their products. We have a strategy in place to regain the Ontrak-A business and are currently in late stage discussions with other customers whose metrics align with our value proposition of an integrated approach to whole health that delivers an average ROI of 3.7, average cost savings of 40% to 50%, and durable clinical outcomes with exceptionally high program retention and member experience scores. Collectively, we have a market opportunity of over $30 billion."

(Emphasis added.)

93.     The press release continued by disclosing certain financial figures, including that the Company no longer expected 100% revenue growth, stating in relevant part:

**Fourth Quarter 2020 and Recent Operating Highlights:**

- Total enrolled members increased to 15,702 at the end of Q4 2020 and stands at 15,822 as of today.
- Effective Outreach Pool of approximately 152,000 at the end of Q4 2020.
- Gross enrollment for the two-month period ended February 28, 2021, excluding the Ontrak-A customer, was 2,683, reflecting a 60% annualized enrollment rate.

\*          \*          \*

**For the year ending December 31, 2021, the Company provides the following outlook:**

- Revenue of $100 Million. ***Initially, we were going to guide to 100% growth with revenues of $165 million. In light of Ontrak-A, we hopefully are being conservative with our $100 million revenue guidance.*** Of that number, approximately $88 million is either already under contract or in the signature phase and those health plan partners are already contemplating further expansions. Moreover, we see tremendous upside with large plans in our pipeline.
- Given the strength of our pipeline, we anticipate returning to a 100% revenue growth rate in 2022.

(Italicized emphasis added.)

94.     Even as Defendant Peizer came clean, he continued making false and misleading statements about what had occurred.  For example, despite stating in the press release that the Company found out Aetna was terminating its contract "after market close on February 21, 2021[,]" former Ontrak employees stated that this news was broken internally in early February. Likewise, though Defendant Peizer in the press release framed Aetna's decision to terminate the contract as stemming from Aetna's evaluation prizing lowest cost per visit over clinical outcomes or longer-term cost savings, the press release does not mention at all that the Company received a corrective action plan from Aetna in July, took very few steps to implement it or otherwise to allay Aetna's concerns, did not substantially answer questions Aetna had about the Company's efficacy and billing practices (including billing for care coach visits that never occurred), and did not provide evidence that seeing care coaches led members to see therapists or provide other evidence of the efficacy of Ontrak's programs.

95.     On news of this press release, the Company's share price declined by approximately 46%, or $27.32, closing at $31.62 per share on March 1, 2021.

96.     In a conference call with investors and analysts later the same day, March 1, 2021, Defendants Medeiros made more false and misleading statements about what had occurred leading up to the contract termination. Defendant Medeiros stated:

> In mid-December, we were notified that despite the data feed being complete, it wasn't going to turn back on until we signed a new contract. And so we put our heads down and had been working with the team on the Aetna side on a new contract since that time.

97.     Defendant Medeiros later stated on the call that "when I received the call late Friday that talked about the termination, it was a surprise. We were working towards a new agreement and an expanded relationship."

98.     The statements by Defendant Medeiros on the March 1, 2021 conference call were false and misleading. The first statement implied that the data feed had been shut off in December due to a general review of all of vendors, and that at that time Aetna began

negotiating a way for the Company to have the data feed turned back on.  However, the feed was shut off in May 2020, stemming from issues that were specific to the Company and that were transmitted to the Company in specific form via the July 2020 corrective action plan. Moreover, Defendant Medeiros indicated that he was taken by surprise when the contract was terminated in late February 2021, despite other former employees of the Company stating that this news had been circulated internally via email and follow-up Zoom meeting in late January or early February.

99.     On March 9, 2021, the Company held another conference call to discuss the financial results for fourth quarter and full year ended December 31, 2020. On this call, Defendant Peizer stated that "[t]he most significant headwind is the Aetna contract termination in June" and that Ontrak "will continue to graduate and disenroll members through the end of June."

100.    Defendant LaVerne further discussed impact the Aetna contract and its loss would have on the Company, stating:

> *In 2020, Aetna represented 58% of total revenue. At the end of 2020, they represented approximately 82% of the outreach pool and 61% of members. During the fourth quarter, the revenue was also 58% of total revenue, yet represented 66% of the average member count.* What this demonstrates is that our average revenue per member during the quarter was less for this customer than the remainder of the business.
>
> As I said before, the revenue per member for all of 2020 was $7,200. Yet excluding Aetna members, it was nearly $9,500.While *the outreach pool will be significantly impacted by the loss of this customer,* the remaining outreach pool should have a significantly increased enrollment rate.

(Emphasis added.)

101.    Defendant Peizer continued on the call by stating that:

> Because we're classified as a provider, *we were seen as an expensive provider* because where our program might seem expensive. But as I pointed out earlier, we're really the lowest cost provider because our savings is so much greater than the actual cost of the program. So like all of our – as I mentioned last week and today, we work with the medical side on all of our health plans.

That's what distinguishes this from – Aetna from the others in our relationship. So we're going to endeavor to engage those that this matters. And believe me, there are people at Aetna and there are people at CVS who bought Aetna that care about the whole health and integrated care of these membership populations.

(Emphasis added.)

102.   On March 16, 2021, Jonathan Mayhew was announced as Defendant Peizer's replacement as CEO, with Defendant Peizer set to transition to Executive Chairman. On April 8, 2021, the Company announced Defendant Medeiros' resignation.

103.   On May 6, 2021, the Company issued a press release announcing its financial results for the first fiscal quarter ended March 31, 2021. The press release acknowledged the decline in members, employees, and revenue outlook, stating:

**First Quarter 2021 and Recent Operating Highlights:**

- Total enrolled members numbered 14,868 at the end of Q1 2021 and decreased to 12,376 as of the date of this release. The transitional disenrollment of members in our Ontrak-A program began in April, and we expect to disenroll the remaining 4,160 Ontrak-A members by the end of June.
- The Company initiated a reduction in workforce as a result of the termination notice from Ontrak-A. The workforce reduction plan, which was designed to effectively align our resources, manage our operating costs, and address the change in staffing needs in the short term, affected approximately 35% of full time positions. We incurred $1.0 million in the current period and estimate $0.3 million to be incurred in the second quarter, with the plan expected to reduce annual compensation expense by approximately $17 million, primarily in cost of revenue.

*          *          *

**For the year ending December 31, 2021, the Company provides the following outlook:**

Given the arrival of Jonathan Mayhew as our CEO, we feel it would be appropriate to revise our guidance to revenue of $80-85 million, reflecting current expectations with our existing health plan customers regarding outreach pool, budget considerations and timing of expansions.

## DAMAGES TO ONTRAK

104.   As a direct and proximate result of the Individual Defendants' misconduct, Ontrak has lost and will continue to lose and expend many millions of dollars.

105.   Such expenditures include, but are not limited to, fees associated with the Securities Class Action filed against the Company and the Company's Executive Chairman, CFO, and former COO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

106.   Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

107.   As a direct and proximate result of the Individual Defendants' conduct, Ontrak has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

108.   Plaintiff brings this action derivatively and for the benefit of Ontrak to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ontrak, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

109.   Ontrak is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

110.   Plaintiff is, and has been at all relevant times, a shareholder of Ontrak. Plaintiff will adequately and fairly represent the interests of Ontrak in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

111.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

112.   A pre-suit demand on the Board of Ontrak is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Peizer, Berman, Giraldo, Seloff, Sherman, Quinn, Rebak, and Zecchini (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

113.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while causing the Company to sell shares of preferred stock at artificially inflated prices in two offerings during the Relevant Period, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

114.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme were intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

115.   Additional reasons that demand on Defendant Peizer is futile follow. Defendant Peizer is the founder, Executive Chairman, and former CEO of Ontrak. Thus, as the Company admits, he is a non-independent director. As CEO during the Relevant Period, Defendant Peizer was ultimately responsible for all of the false and misleading

statements and omissions that were made during the Relevant Period, including those he personally made in conference calls and in press releases as well as those contained in the 2Q20 10-Q and 3Q20 10-Q, which he personally signed and for which signed SOX certifications. As Executive Chairman, the Company provides Defendant Singh with his principal occupation for which he receives handsome compensation. Thus, he cannot disinterestedly consider a demand to sue the directors that control his continued employment, other members of management with whom he worked or still works, and himself. Moreover, Defendant Peizer is named as a defendant in the Securities Class Action. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Peizer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116.   Additional reasons that demand on Defendant Berman is futile follow. Defendant Berman has served as a Company director since 2014. Defendant Berman is entitled to significant compensation for his services. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Berman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

117.   Additional reasons that demand on Defendant Sherman is futile follow. Defendant Sherman has served as a Company director since 2017. Defendant Sherman is entitled to significant compensation for his services. As a trusted Company director, he

Verified Shareholder Derivative Complaint

conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Sherman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118. Additional reasons that demand on Defendant Zecchini is futile follow. Defendant Zecchini has served as a Company director since 2018. Defendant Zecchini is entitled to significant compensation for his role at the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Zecchini breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119. Additional reasons that demand on Defendant Seloff is futile follow. Defendant Seloff has served as a Company director since 2018. Defendant Seloff is entitled to significant compensation for her role at the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Seloff breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

120. Additional reasons that demand on Defendant Rebak is futile follow. Defendant Rebak has served as a Company director since 2019. Defendant Rebak is entitled to significant compensation for his role at the Company. As a trusted Company

director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Rebak breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121. Additional reasons that demand on Defendant Giraldo is futile follow. Defendant Giraldo has served as a Company director since 2019. Defendant Giraldo is entitled to significant compensation for his role at the Company. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Giraldo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122. Additional reasons that demand on Defendant Quinn is futile follow. Defendant Quinn has served as a Company director since August 2020. Defendant Quinn is entitled to significant compensation for her role at the Company. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Quinn breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

123. Additional reasons that demand on the Board is futile follow.

124. Defendant Peizer, in addition to leading the Board as Executive Chairman, is a majority shareholder with beneficial ownership of 52.1% of the Company's common

stock as of June 10, 2021. In light of this of this, the Directors cannot impartially consider a demand against Defendant Peizer, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the lucrative compensation that goes with that. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Peizer's control over them.

125.   Defendants Berman, Seloff, and Giraldo (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. The Audit Committee Defendants are responsible for overseeing, among other things, the quality and integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls and failed to ensure compliance with laws and regulations as they are charged to do. The Audit Committee Defendants failure ensure to adequate internal controls were in place caused the Company to issue false and misleading financial statements to investors and file false and misleading quarterly reports with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

126.   Ontrak has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Ontrak any part of the damages Ontrak suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

127.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be

presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

128.   The acts complained of herein constitute violations of fiduciary duties owed by Ontrak's officers and directors, and these acts are incapable of ratification.

129.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ontrak. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Ontrak, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

130.   If there is no directors' and officers' liability insurance, then the Directors will not cause Ontrak to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

131.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

132.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ontrak's business and affairs.

134.   Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

135.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ontrak.

136.   In breach of their fiduciary duties owed to Ontrak, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was being evaluated on how it executed on a corrective action plan sent by its largest customer, though the Company had no plans to meaningful address this corrective action plan; (2) due to this evaluation, the Company's largest customer was not likely to find Ontrak to be effective and was therefore likely to not renew its contract with Ontrak; (3) the loss of its largest customer would significantly harm the Company's revenue and financial results; (4) therefore, Ontrak could not achieve its projected revenue guidance for the 2021 fiscal year; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Ontrak's public statements were materially false and misleading at all relevant times.

137.   The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

138.   Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

139.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Ontrak's securities.

140.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Ontrak's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

141.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

142.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ontrak has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

Verified Shareholder Derivative Complaint

143.   Plaintiff on behalf of Ontrak has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

144.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ontrak.

146.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Ontrak that was tied to the performance or artificially inflated valuation of Ontrak, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

147.   Plaintiff, as a shareholder and a representative of Ontrak, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

148.   Plaintiff on behalf of Ontrak has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

149.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

150.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ontrak, for which they are legally responsible.

151.   As a direct and proximate result of the Individual Defendants' abuse of control, Ontrak has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

152.   Plaintiff on behalf of Ontrak has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

153.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ontrak in a manner consistent with the operations of a publicly-held corporation.

155.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ontrak has sustained and will continue to sustain significant damages.

156.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

157.   Plaintiff on behalf of Ontrak has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

158.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

160.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Ontrak

to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

161.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

162.   Plaintiff on behalf of Ontrak has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Peizer, LaVerne, and Medeiros for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

163.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

164.   Ontrak, and Defendants Peizer, LaVerne, and Medeiros are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Peizer's, LaVerne's, and Medeiros' willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or director of Ontrak.

165.   Defendants Peizer, LaVerne, and Medeiros because of their positions of control and authority as CEO and controlling shareholder, CFO, and COO, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Ontrak, including the wrongful acts complained of herein and in the Securities Class Actions.

166.   Accordingly, Defendants Peizer, LaVerne, and Medeiros are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D

39

Verified Shareholder Derivative Complaint

of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

167.   As such, Ontrak is entitled to receive all appropriate contribution or indemnification from Defendants Peizer, LaVerne, and Medeiros.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Ontrak, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ontrak;

(c)   Determining and awarding to Ontrak the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Ontrak and the Individual Defendants to take all necessary actions to reform and improve Ontrak's corporate governance and internal procedures to comply with applicable laws and to protect Ontrak and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Ontrak to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of

compliance with applicable laws, rules, and regulations;

      (e)    Awarding Ontrak restitution from Individual Defendants, and each of them;

      (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 6, 2021           Respectfully submitted,

                      **THE BROWN LAW FIRM, P.C.**

                      <u>    /s Robert C. Moest         </u>.
                      Robert C. Moest, Of Counsel, SBN 62166
                      2530 Wilshire Boulevard, Second Floor
                      Santa Monica, California 90403
                      Telephone: (310) 915-6628
                      Facsimile: (310) 915-9897
                      Email: RMoest@aol.com

                      **THE BROWN LAW FIRM, P.C.**
                      Timothy Brown
                      767 Third Avenue, Suite 2501
                      New York, NY 10017
                      Telephone: (516) 922-5427
                      Facsimile: (516) 344-6204
                      Email: tbrown@thebrownlawfirm.net

                      *Counsel for Plaintiff*

## VERIFICATION

I, Michael Anderson am a plaintiff in the within action. I have reviewed the allegations made in this verified consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalt̶y̶ ̶t̶h̶a̶t̶ ̶t̶h̶e̶ ̶f̶o̶l̶l̶ow̶ing is true and correct. Executed this _th day of 10/6/2021 , 2021

MICHAEL ANDERSON
277F391C337A4FD...

Michael Anderson